UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT L. HARRINGTON,

Petitioner,

v

KEN McKEE, WARDEN, BELLAMY CREEK CORRECTIONAL FACILITY,

Respondent.
_________________________________/

Case No. 1:05-cv-468

Hon. Wendell A. Miles

**OPINION AND ORDER**

This matter is before the court on a *pro se* petition by Michigan prisoner Robert L. Harrington for a writ of habeas corpus under 28 U.S.C. § 2254. Following a second trial, a jury found petitioner guilty but mentally ill of second-degree murder, arson, possession of a firearm during the commission of a felony, and five counts of assault with intent to commit murder. He was sentenced to concurrent terms of imprisonment of 66 years, eight months to 100 years for the second-degree murder conviction, 50 to 90 years for each assault conviction, and five to 10 years for arson. These concurrent terms are to be followed by a consecutive two-year sentence for the felony-firearm conviction. Petitioner is currently incarcerated at Michigan's Kinross Correctional Facility.[1]

The petitioner challenges both the convictions and sentences. The respondent has filed an

[1]At the time he filed this action, petitioner was incarcerated in the state's Bellamy Creek Correctional Facility, where Kenneth McKee is warden.

answer, asserting that the petition must be denied because (1) all but one of the claims asserted in the petition are procedurally defaulted, and (2) the remaining undefaulted claim fails to allege a violation of a federal constitutional right. After reviewing the petition, briefs, and underlying record, the court concludes that the petition must be DENIED.

## I

## Background

Petitioner's convictions arise from events which took place on June 11, 1982. On that date, petitioner walked into the offices of the law firm of Bell and Hudson, located on the eighth floor of the Buhl building in Detroit, Michigan. At the time, petitioner carried with him a shotgun, a pistol, and a glass jar containing gasoline. Petitioner, who had hired the firm to represent him in an insurance dispute, demanded money he believed was owed to him. When his demand was not met, petitioner began shooting indiscriminately. He also used the gasoline to set the firm's offices on fire.

By the time petitioner was apprehended, he had killed Eve August, a law student who was employed as a summer law clerk at the firm. Petitioner had also shot and seriously wounded two other firm employees, who also suffered smoke inhalation. Petitioner also shot and wounded another tenant in the building, a private investigator who was armed and managed to return fire, striking petitioner. Two other Bell and Hudson employees were also seriously injured when they either jumped or fell from the building's eighth floor windows in an apparent attempt to escape the fire, which ultimately gutted the firm's offices before being extinguished.

According to petitioner's family members, some time before the incident petitioner had

begun exhibiting somewhat odd behavior. Apparently believing that there was a conspiracy against him involving law enforcement authorities and others, and fearing that he was under surveillance, petitioner had surrendered his driver's license and cancelled his telephone service. He became obsessed with reading the Bible, and was convinced that the world was going to end. Petitioner, who had been working as an insurance salesman, also began to believe that he was being cheated out of money at work, and expressed the belief that persons at the insurance office where he worked were conspiring to drain his "essence" by encouraging him to sleep with white females. (Petitioner is African-American.) Petitioner had refused psychiatric help. Although he might have believed that the Bell and Hudson firm was part of the conspiracy against him, it is clear that a demand for money was what prompted petitioner to target the firm on the day of the incident.

During the incident, petitioner was shot in the arm by Walter Herndon, a private investigator who was armed and who happened to have eighth floor office space in the Buhl building near the offices of the Bell and Hudson firm. (Herndon himself was shot in the foot by petitioner before returning fire.) After the incident was over and petitioner was apprehended, he was taken to Detroit Receiving Hospital, where he was admitted and treated for his wound as well as for burns and smoke inhalation resulting from the fire he had set. Petitioner was given oxygen therapy and was not restricted from having visitors.

At about 7:00 p.m. on the date of the incident, petitioner was visited at the hospital by two investigators, Lieutenant William Peck and Lieutenant Colm Prentice. Both Peck and Prentice were employed by the Detroit Fire Department's arson squad. Petitioner was awake and alert during their visit, and expressed an eagerness to talk to the investigators. After being read his

rights, petitioner – who removed an oxygen mask he had been wearing – made the following statement:

> I had a fire at [my] house about one year ago. I hired Ed Bell to sue and settle my claim with the insurance company. I gave him two thousand five hundred dollars that was in January [sic]. He had not gotten me nothing. I have had trouble at work and lots of other things have been bad for me. Today everything built up and I was upset. I blew my top. I got the shot gun from the bedroom closet. I got the twenty two caliber pistol. I put gasoline in a jar in the basement and filled it with gasoline from a can in my garage. I took the gun and gasoline and told my wife I am going to get my money from [Ed] Bell. I told her if I did not get my money I would be dead.
>
> I took the bus downtown to [Ed] Bell's office downtown. I went into his office. I had the shotgun under my coat[, t]he gasoline in my coat pocket. The pistol was in my belt. I set down in the front part of the office. Bell came out and I asked him for my money back and he told me your money is not here. He treated me like shit. I blew my top. I pulled the shotgun and fired at him. I did not see where he went. I started shooting. I had a box of shotgun shells in my pocket. I went into a room and threw the jar of gasoline down on the floor. I fired the gun into the gasoline and it flashed up and caught my pants on fire.

Transcript of Jury Trial, Dec. 10, 1996 (docket no. 32) at 55-56. During the interview, petitioner also expressed apparent remorse for his actions, telling the investigators "don't ever do what I have done it is not worth it." Id. at 72. Peck and Prentice immediately discontinued the interview when a lawyer hired by petitioner's brother entered the hospital room. Id. at 56.

Before his first trial, petitioner filed a motion to suppress his statements, seeking a *Walker* hearing.[2] The trial court granted petitioner a *Walker* hearing,[3] which was scheduled to take place

---

[2]The prevailing practice in Michigan courts is to denominate all hearings challenging the constitutional validity of a confession as "*Walker* hearings," insofar the procedure for separate hearings was initiated by the Michigan Supreme Court's pronouncement in People v. Walker, 132 N.W.2d 87 (Mich. 1965).

[3]See Transcript, Opinion of the Court (Motion), Sept. 24, 1982 at 34 (docket no. 20).

before the trial judge on November 22, 1982.[4]  The hearing was actually held on November 22

and 23, 1982.[5]  Three witnesses testified at the hearing: arson investigators Peck and Prentice and

Leta Smith, a nurse at Detroit Receiving Hospital who was working when petitioner was

admitted.  Petitioner himself did not testify, nor did he seek to present the testimony of any

doctors who had treated or examined him during his hospitalization.  At the conclusion of the

hearing, the trial court ruled petitioner's statements admissible and denied the motion to suppress.

     The petitioner was first tried before a jury sitting in Detroit Recorder's Court in January,

1983.  At trial, the defense did not dispute that petitioner had committed the offenses, but instead

asserted that petitioner was not guilty by reason of insanity.  After this first trial, petitioner was

convicted on all charges, including first-degree murder for the death of Eve August, for which he

was sentenced to life imprisonment without parole.

     Petitioner did not immediately appeal his conviction.  Instead, several years later, he filed

an application for leave to file a late appeal in the Michigan Court of Appeals.  That court

ultimately reversed petitioner's conviction, on the basis that the trial court had improperly

instructed the jury on petitioner's sole defense of legal insanity.  Although the prosecution filed

an application for leave to appeal this decision to the Michigan Supreme Court, and petitioner

sought leave to cross-appeal on various other issues[6], that court declined to review the case.

     The case was therefore returned to the trial court for a retrial.  No new hearing was held

---

[4]See Transcript, Oct. 1, 1982 at 14-15 (docket no. 21).

[5]As the court will discuss in greater detail in Part IV.A.1. of this decision below, even though the respondent's brief has both cited and ostensibly quoted the transcript of the *Walker* hearing, no complete copy of that transcript has been made a part of the record in this case.

[6]Although petitioner raised additional issues in his direct appeal, the Michigan Court of Appeals' decision addressed only the issue of the jury instruction on insanity.

on the suppression motion before the second trial.[7]  The trial court therefore presumably proceeded based on the previous ruling denying suppression. Upon retrial, a jury again convicted petitioner, this time finding him guilty but mentally ill ("GBMI") of second-degree murder, arson, possession of a firearm during the commission of a felony, and five counts of assault with intent to commit murder.[8]  The trial court sentenced petitioner to concurrent terms of imprisonment of 75 to 100 years for the second-degree murder conviction, 50 to 90 years for each assault conviction, and 5 to 10 years for arson, to be followed by a consecutive two-year sentence for the felony-firearm conviction.

Petitioner again appealed.  Although his sentence on the second-degree murder charge was vacated based on Michigan's "two-thirds" rule, petitioner's conviction and remaining sentences were affirmed.[9]  On remand, the trial court resentenced petitioner to a  minimum prison term of 66 years and eight months to a maximum of 100 years.

## II

[7]It does not appear that a new hearing on the motion to suppress was requested, insofar as the record indicates that the defense did not file a renewed notice of its intent to rely on the insanity defense after the remand.  Transcript of Jury Trial, December 2, 1996 (docket no. 28) at 18-19.

[8]Under Michigan law, a guilty but mentally ill verdict "does not absolve a defendant of criminal responsibility." People v. Stephan, 616 N.W.2d 188, 194 (Mich. Ct. App. 2000). A defendant found guilty but mentally ill is subject to any sentence that may be imposed on any other defendant convicted of the same offense, although the law provides that the defendant "shall undergo further evaluation and be given such treatment as is psychiatrically indicated for his or her mental illness or retardation."  M.C.L. § 768.36(3).

[9]In People v. Tanner, 199 N.W.2d 202, 204-205 (Mich. 1972), the court held that "any sentence which provides for a minimum exceeding two-thirds of the maximum is improper as failing to comply with the indeterminate sentence act."

**Procedural Background**[10]

After his second conviction, petitioner filed a claim of appeal in the Michigan Court of Appeals. On appeal, petitioner was represented by a different attorney than the one who defended him at trial. His appeal raised the following issues:

I. The trial court violated petitioner's due process rights by refusing to suppress involuntary statements made to fire investigators from petitioner's hospital bed, when petitioner was mentally ill and being treated for a gunshot wound, burns, and smoke inhalation.

II. The trial court should have suppressed petitioner's statements because they were made without benefit of an audio or video recording.

III. The "guilty but mentally ill" verdict violated due process by unfairly encouraging conviction.

The Michigan Court of Appeals affirmed petitioner's conviction. People v. Harrington, No. 202467, Order, 2000 WL 33419427 (Mich. Ct. App. May 19, 2000).

Petitioner then filed an application for leave to appeal in the Michigan Supreme Court. In his application, petitioner raised the same claims which he had raised in the Michigan Court of Appeals. The Michigan Supreme Court denied the application, on the basis that it was "not persuaded that the questions presented should be reviewed by this Court." People v. Harrington, No. 117036, Order (Mich. Oct. 30, 2000) (docket no. 51).

Petitioner later filed a motion for relief from judgment in the trial court under M.C.R.

[10]The court's discussion of the procedural background of the case is limited to proceedings occurring after petitioner's retrial.

6.500.[11]   In rather lengthy and rambling fashion, petitioner raised the following claims:

I.      Petitioner is entitled to relief from the judgment of sentence because he was deprived of his liberty without due process of law, under both the United States and Michigan constitutions, by failure of the trial court to articulate on the record at the time of sentencing any objective reason for imposition of the sentences, pursuant to People v. Snow, 194 N.W.2d 314 (Mich.1972).

II.     Petitioner is entitled to relief from the judgment of sentence because he was deprived of his fundamental right to due process under federal and state constitutional law, when the trial court relied on an impermissible independent finding of guilty on a charge not resulting in conviction and then sentenced petitioner on the basis of that independent finding.[12]

III.    Petitioner is entitled to relief from the judgment of sentence because the sentences of 50 to 90 years fail to comply with People v. Moore, 439 N.S.2d 684 (Mich. 1989).  The sentences are also disproportionate and fail to comply with People v. Milbourn, 461 N.W.2d 1 (Mich. 1990).

IV.    Petitioner is entitled to relief from the judgment of sentence because the trial court relied on improper conjectural considerations in order to enhance the sentence and depart from the sentencing guidelines.  This violates both federal and state constitutional law by depriving petitioner of due process and equal protection.

V.     Petitioner is entitled to relief from the judgment of sentence where the sentence is invalid under the federal and state constitutional law, and due process has been denied in the sentence proceeding.

VI.    Petitioner is entitled to relief from the judgment of sentence because the trial court failed to articulate on the sentence

---

[11]The 101-page *pro se* brief which petitioner filed in support of this motion in the trial court is included as part of the supplementary materials petitioner has filed with the petition (docket no. 2).

[12]Petitioner's reference to a "charge not resulting in conviction" was directed to the first-degree murder charge.

information report the aspect of the case that persuaded the court to impose a sentence outside the recommended minimum range, pursuant to the "departure policy" contained in the Michigan Sentencing Guidelines (1988 2d edition).

VII.     Petitioner is entitled to relief from an unlawful consecutive sentence imposed by the trial court.

VIII.    Petitioner is entitled to relief from the unlawful consecutive sentence and to have the record corrected to reflect the lawful disposition as provided for by law under People v. Johnson, 225 N.W.2d 704 (Mich. Ct. App. 1974).

IX.      Petitioner is entitled to relief from the judgment because he was denied due process and a fair trial when the trial judge failed to instruct the jury on the concept of voluntary manslaughter, assault with intent to do great bodily harm less than murder, and felonious assault.

X.       Petitioner was denied equal protection under the law when the prosecutor specifically invited the jury to compromise between the verdict of guilty and not guilty by reason of insanity by picking the middle ground of guilty but mentally ill, thereby depriving petitioner of his fundamental rights to due process and a fair trial.

XI.      Petitioner is entitled to have his involuntary statements made to fire investigators suppressed when critical words were left out which affected the validity of the statements, making it deceptive in nature, and depriving the petitioner of a fair trial.

XII.     Petitioner is entitled to relief from the judgment under federal and state constitutional law, where the trial court erroneously refused to consider the petitioner's mental illness and medical records, as well as the petitioner's lack of previous experience with the police, in determining the admissibility of the petitioner's statements and failing to suppress the involuntary statements.  Consequently, the trial court denied petitioner's rights to due process and equal protection under the law.

XIII.    Petitioner was deprived of is right to the effective assistance of an appellate counsel in his first appeal as of right guaranteed by the United States and Michigan constitutions, by the deficient and ineffective performance of his appellate counsel.

The trial court denied the motion for relief from judgment, finding that petitioner had failed to show good cause and actual prejudice under M.C.R. 6.508(D) for his appellate attorney's failure to raise the issues raised in the motion. In finding that petitioner had failed to show actual prejudice, the trial court determined that none of the issues presented by the motion were meritorious.[13]

Petitioner, through counsel, filed a delayed application for leave to appeal in the Michigan Court of Appeals. His application raised the following issues:

I. Petitioner is entitled to relief from the judgment of sentence because he was deprived of his liberty without due process of law, under both the United States and Michigan constitutions, by failure of the trial court to articulate on the record at the time of sentencing any objective reason for imposition of the sentences.

II. Petitioner is entitled to relief from the judgment of sentence because he was deprived of his fundamental right to due process under federal and state constitutional law, when the trial court relied on an impermissible independent finding of guilty on a charge for which he was not convicted and then sentenced petitioner on the basis of that independent finding.

III. Petitioner is entitled to relief from the judgment of sentence because the sentences of 66 years, eight months to 100 years and multiple sentences of 50 to 90 years fail to comply with People v. Moore, 439 N.W.2d 684 (Mich. 1989), and are also disproportionate and fail to comply with People v. Milbourn, 461 N.W.2d 1 (Mich. 1990). As such, the sentences are invalid.

IV. Petitioner is entitled to relief from the judgment of sentence because the sentence is invalid under federal and state constitutional law, and due process has been denied in the sentence proceeding by the upward departure from the guidelines and failure to consider mitigating circumstances.

---

[13]The trial court's opinion denying the motion for relief from judgment is included as part of the supplementary materials petitioner has filed with the petition (docket no. 2).

V.      Petitioner is entitled to relief from the judgment of sentence
        because the trial court failed to articulate on the sentence
        information report reasons why the court imposed a sentence
        outside the recommended minimum range, pursuant to the
        "departure policy" contained in the Michigan Sentencing
        Guidelines (1988 2d edition).

VI.     Petitioner is entitled to relief from an unlawful consecutive
        sentence as provided for by law in People v. Johnson, 225 N.W.2d
        704 (Mich. Ct. App. 1974).

VII.    After an examination of the whole record, an independent
        determination of the admissibility of the petitioner's confession
        shows that petitioner's right to due process and right to counsel
        were violated when the trial court failed to suppress the confession.

VIII.   Petitioner was denied equal protection under the law when the
        prosecutor specifically invited the jury to compromise between the
        verdict of guilty and not guilty by reason of insanity by picking the
        middle ground of guilty but mentally ill, and vouched for the
        credibility of his expert, thereby depriving petitioner of his
        fundamental rights to due process and a fair trial.

IX.     Petitioner was denied due process and a fair trial under the federal
        and state constitutions when the trial judge refused to instruct the
        jury on the requested lesser offenses of voluntary manslaughter,
        assault with intent to do great bodily harm, and felonious assault.

X.      Petitioner has established an entitlement to relief from the
        judgment of conviction and sentence by demonstrating good cause
        for the failure to raise the present claims on direct appeal or in a
        prior motion and actual prejudice from the alleged irregularities in
        the criminal process.

The Michigan Court of Appeals denied the delayed application for leave to appeal "for failure to

meet the burden of establishing entitlement to relief under MCR 6.508(D)."   People v.

Harrington, No. 255571, Order (Mich. Ct. App. Dec. 16, 2004) (docket no. 52).

    Petitioner, through counsel, then filed an application for leave to appeal in the Michigan

Supreme Court.  In his application, petitioner raised the same claims which he had raised in the

Michigan Court of Appeals. The Michigan Supreme Court denied the application, on the basis that petitioner had "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." People v. Harrington, No. 127928, Order (Mich. May 31, 2005) (docket no. 53). Petitioner filed his habeas petition in this court on July 8, 2005.

## III

## Standard of Review

Title 28 U.S.C. § 2254(d) imposes the following standard of review in this habeas case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has explained that

> Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-413 (2000). "Under § 2254(d)'s 'unreasonable

application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). "The federal habeas scheme leaves primary responsibility with the state courts for these judgments, and authorizes federal-court intervention only when a state-court decision is objectively unreasonable." Id. at 27.

The statutory phrase "clearly established Federal law, as determined by the Supreme Court of the United States," refers to "the holdings, as opposed to the dicta, of [the United States Supreme Courts'] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them. Early v. Packer, 537 U.S. 3, 8 (2002). Instead, it is sufficient that the result and reasoning are consistent with Supreme Court precedent. Id. Moreover, a state court "does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent; it may hold a view that is different from this court or another federal court." Slagle v. Bagley, 457 F.3d 501, 514 (6th Cir. 2006) (citing Mitchell v. Esparza, 540 U.S. 12, 17 (2003)).

Federal law also requires considerable deference to findings of fact made by the state courts. Johnson v. Luoma, 425 F.3d 318, 324 (6th Cir. 2005). "[S]tate findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence." Baze v. Parker, 371 F.3d 310, 318 (6th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)). "This presumption of correctness also applies to the factual findings of a state appellate court based on the state trial record." Brumley v. Wingard, 269 F.3d 629, 637 (6th Cir.2001) (citing Sumner v. Mata, 449 U.S. 539, 546-547 (1981)).

**IV**

**Discussion of Claims**

Petitioner raises the following grounds as the bases for habeas relief in this case:

1. Violations of due process, right against self-incrimination, and right to counsel. The trial court denied me a hearing and expansion of record regarding mental illness as it related to an involuntary confession without counsel. Denying me a fair trial. I had no criminal background and lacked understanding, with severe mental illness during custody interrogation. Investigator Lt. Peck repeatedly deceived me saying he was there to help me. Also excessive sentencing in 7 of 8 counts 5 times as much and 40 years based on feeling not legal reasons, improper assumption contrary to jury, proper consideration of mitigating factors denied.

2. Violations of fair trial and impartial jury, and an effective appellate counsel. The judge did not give proper requested instructions for jury deliberation on all the evidence at trial. This denied me a fair trial and impartial jury, and sentenced me for first degree murder which jury acquitted me of. I had no meaningful appeal of right. Appellate counsel refused to raise these obvious constitutional deficiency at my request. The court refused my motion for hearing on counsel performance.

3. Infliction of cruel and/or unusual punishment. The judge excessive punishment in sentencing 7 of 8 counts when I had no prior and was severely mentally ill was cruel, unjust, unusual, and unreasonable to detain me for sixty-six to hundred years, given the many mitigating circumstances surrounding the offense my nature and background. I am a honorably discharged veteran and I maintain my innocence of all criminal charges by “reason of insanity.” My conviction and sentences is constitutionally immoral and unjust punishment.

4. Violations of due process and equal protection. When my first conviction was reverse in 1995 my prison conviction of 1986 for prison charge 1985 should have been corrected voiding habitual, resentencing and discharging with ten years time served. Before December 1996 retrial, even without record correction I should not have been consecutively sentenced to a 1986 conviction on a 1982 first charge ever. More, prosecutor’s closing arguments denied me

an impartial jury and fair trial by vouching and 3 times encouraging jury to compromise its verdict between "guilty" and "not guilty by reason of insanity" for "GBMI."

As may be noted, these grounds are somewhat jumbled and repetitive. In his response to the petition, the respondent has addressed only one of the claims on the merits: the claim regarding petitioner's confession. As for the remainder of petitioner's claims, the respondent argues that these are procedurally defaulted.

**A. Petitioner's Confession**

Petitioner's first claim is that the trial court should have suppressed the statements he made to fire investigators while he was hospitalized after the incident. According to petitioner, these statements amounted to an "involuntary confession" because he was mentally ill at the time and unable to understand or waive his rights. The respondent, however, argues that the state courts reasonably adjudicated this claim, finding petitioner's statements to be voluntary and not coerced.

**1. Missing Transcript of *Walker* hearing**

In his answer to the petition, the respondent has cited to and quoted from a transcript of the *Walker* hearing held in the trial court. Respondent's Answer to Petition for Writ of Habeas Corpus at 10, 13. A portion of what appears to be a copy of this transcript has been included as an appendix to petitioner's brief filed on direct appeal to the Michigan Court of Appeals following his second trial. See Defendant-Appellant's Brief on Appeal, Dec. 18, 1998, Appx. B (included as part of docket no. 50). This presumed partial copy contains only the trial court's

ruling on the motion to suppress; no witness testimony is included in this excerpt, and no complete copy of this transcript has been made a part of the record. Although the court ordered the respondent to file a copy of the transcript as a supplement to the Rule 5 materials, the respondent answered this order by informing the court that the transcript is "missing" from the trial court's file. Answer to Order to Supplement Record (docket no. 66).[14]

The applicable law appears to place the burden on a habeas petitioner who challenges the sufficiency of the evidence in a state court proceeding to produce the part of the record pertinent to the state court's determination on that issue – at least initially. Specifically, 28 U.S.C. § 2254(f) provides as follows:

> If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination. If the applicant, because of indigency or other reason is unable to produce such part of the record, then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official. If the State cannot provide such pertinent part of the record, then the court shall determine under the existing facts and circumstances

[14]It is virtually certain not only that the hearing was transcribed, but also that petitioner had a copy of the transcript available to him when he filed his delayed application for leave to appeal several years after his initial conviction. The Rule 5 materials filed as part of this first appeal include the court reporter's April 22, 1991 Notice of Filing of Transcript, indicating that a 135-page transcript of a "motion" had been filed in the trial court. This notice is included as Exhibit C to petitioner's Application for Delayed Appeal (filed as part of docket no. 44). In addition, petitioner's Brief in Support of this application for leave to file a late appeal, which raises the issue of the admission of petitioner's custodial statement, contains cites to a transcript identified as "EH," presumably an abbreviation intended to refer to the evidentiary hearing transcript. Id. at 6-7, 17-19. Moreover, the page numbers which petitioner provides in that brief as reflecting the trial court's ruling on the motion ("EH 127-131") coincide precisely with the numbered transcript pages petitioner included in the appendix to his brief filed on appeal after the retrial (docket no. 50). Because the transcript was undoubtedly available to him during both appeals, it is not surprising that petitioner does not appear to have ever argued in state court that this transcript was not available.

what weight shall be given to the State court's factual determination.

Rule 5(c) of the Rules Governing Section 2254 Cases requires that the respondent's answer to a habeas petition must "indicate what transcripts are available," and "attach to the answer parts of the transcript that the respondent considers relevant."  However, Rule 5(c) further provides that if a transcript "cannot be obtained, the respondent may submit a narrative summary of the evidence."  As section 2254(f) clearly provides, it is this court which must determine what weight must be given to the state court's factual determination in the absence of a relevant part of the record.  Certainly, nothing in section 2254(f) requires the district court to review a transcript before making a decision on a particular claim.

 Moreover, even though the respondent has not produced a narrative summary of the testimony presented at *Walker* hearing (as permitted by Rule 5(c)), portions of the testimony have been summarized in other materials which have been filed with the court, including the respondent's brief and various Rule 5 materials which cite to the *Walker* hearing transcript. Testimony presented during the retrial also documents petitioner's behavior at the time of his statements.  Given the availability of this wealth of information regarding the circumstances under which petitioner made his statements, the court concludes that the state court's findings of fact on matters relevant to petitioner's motion to suppress should be given the same weight they would have even if the *Walker* hearing transcript had been produced.  Therefore, the court gives those findings a presumption of correctness.

In his petition, petitioner refers to the trial court's denial of an "expansion of the record regarding mental illness as it related to an involuntary confession[.]" It is unclear to what "expansion" petitioner is referring.  However, his trial counsel appears to have relied solely on

petitioner's physical condition while hospitalized as the sole basis for the motion to suppress. Although it is unclear whether counsel argued at the *Walker* hearing that petitioner suffered from mental illness, what is clear is that counsel did not seek to introduce testimony at the hearing regarding petitioner's mental health, nor did counsel request a second *Walker* hearing for the purpose of addressing the issue of petitioner's mental condition at the time of his statements.[15] In addition, counsel still had the opportunity during the trial to fully explore the circumstances surrounding petitioner's custody and his statements, including his mental condition at the time. See Lego v. Twomey, 404 U.S. 477, 485-486 (1982) ("A defendant has been as free since [Jackson v. Denno, 378 U.S. 368 (1964)] as he was before to familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness"); People v. Gilbert, 222 N.W.2d 305, 307 (Mich. Ct. App. 1974) (determination that defendant's confession is admissible "merely placed the confession on an equal footing with all other properly admitted evidence. Defendant is as free as he was before the *Walker* hearing to familiarize the jury with the circumstances that attended the taking of his confession, including facts bearing on voluntariness, to impeach its credibility or to challenge the fact that it was ever given at all"). In addition, petitioner had another opportunity to raise the issue in the Michigan Court of Appeals, which addressed petitioner's claim that his statements were not voluntary and expressly rejected it.

To the extent that petitioner seeks an evidentiary hearing in this court to further explore

[15]On direct appeal after the retrial, the Michigan Court of Appeals observed that petitioner "did not produce any evidence of mental illness at the suppression hearing." Harrington, 2000 WL 33419427, at *2. The court further observed that petitioner "failed to renew his motion to suppress so that he could present additional evidence regarding his mental illness once he had obtained experts willing to testify that he was mentally ill." Id.

the circumstances surrounding his statements, he has not shown that he is entitled to such a hearing. The AEDPA has greatly curtailed federal habeas court discretion to conduct evidentiary hearings. "AEDPA generally prohibits federal habeas courts from granting evidentiary hearings when applicants have failed to develop the factual bases for their claims in state courts." Schriro v. Landrigan, 127 S.Ct. 1933, 1939 n.1 (2007) (citing 28 U.S.C. § 2254(e)(2)). "If a habeas petitioner has 'failed to develop the factual basis of a claim in State court proceedings,' he can only get an evidentiary hearing in federal district court on that claim in extremely narrow circumstances." Alley v. Bell, 307 F.3d 380, 389 (6th Cir. 2002). None of these circumstances applies here. See 28 U.S.C. § 2254(e)(2). The court therefore addresses petitioner's claim based on the record which has already been generated in the state courts.

**2. Merits**

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself[.]" Under federal law, a confession obtained during custodial interrogation may be deemed to be unconstitutional on at least two grounds: (1) that the confession was involuntary, see, e.g., Jackson v. Denno, 378 U.S. 368, 376-377 (1964) ("a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession"), and (2) that the detainee was not advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Petitioner argues that he is entitled to habeas relief because the statements which he made after his arrest while he was hospitalized – and which were used against him at trial – were obtained in violation of each of these proscriptions, insofar as he was mentally ill and not capable of waiving his

rights.

"[T]he privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.'" Pennsylvania v. Muniz, 496 U.S. 582, 589 (1990) (quoting Miranda, 384 U.S. at 461).  Under Miranda, "[s]tatements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been [apprised] of the constitutional right against self-incrimination and has validly waived his right." United States v. Cole, 315 F.3d 633, 636 (6th Cir. 2003) (citing Miranda, 384 U.S. at 478-79).   Specifically, in order to protect the privilege against self-incrimination, before any questioning, an individual must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 479.  "Unless a suspect 'voluntarily, knowingly and intelligently' waives these rights, . . . any incriminating responses to questioning may not be introduced into evidence in the prosecution's case in chief in a subsequent criminal proceeding." Muniz, 496 U.S. at 589 (citation omitted).  "[A]ny criminal trial use against a defendant of his involuntary statement is a denial of due process of law, 'even though there is ample evidence aside from the confession to support the conviction.'" Mincey v. Arizona, 437 U.S. 385, 398 (1978) (citations omitted).  Therefore, if a criminal defendant's statements were not the product of a rational intellect and a free will, his conviction cannot stand. Id.

In this case, there is no question that even though petitioner was hospitalized after his

arrest, he was considered to be "in custody" for purposes of *Miranda*.  The court also assumes, because the respondent has not disputed, that petitioner was subjected to "interrogation" by the arson investigators.  In addition, there is no question that petitioner was informed of his rights. The disputed issue is whether petitioner voluntarily, knowingly, and intelligently waived those rights.

"[W]hen a confession challenged as involuntary is sought to be used against a criminal defendant at his trial, . . . the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."  Lego v. Twomey, 404 U.S. 477, 489 (1972).  However, "[i]n a federal habeas action, the burden of proving that the confession was involuntary rests with the petitioner."  Boles v. Foltz, 816 F.2d 1132, 1136 (6th Cir. 1987).  A confession is considered involuntary if (1) the police extorted the confession by means of coercive activity; (2) the coercion in question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne because of the coercive police activity in question.  McCall v. Dutton, 863 F.2d 454, 459 (6th Cir.1988) (citations omitted).   Although each confession case turns "on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct.  Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."  Colorado v. Connelly, 479 U.S. 157, 163-164 (1986).  Therefore, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  Id. at 167.

In determining whether a confession is voluntary, the ultimate question is "whether, under

the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution[.]" Miller v. Fenton, 474 U.S. 104, 112 (1985). Those circumstances include whether there was police coercion, a "crucial element," the length of interrogation, the location of the interrogation, the continuity of interrogation, the suspect's maturity, his education, his physical condition and mental health, and whether the suspect was advised of his *Miranda* rights. See Withrow v. Williams, 507 U.S. 680, 693-694 (1993). The ultimate question for a court is " 'whether a defendant's will was overborne by the circumstances surrounding the giving of a confession.' " Dickerson v. United States, 530 U.S. 428, 434 (2000) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).

To the extent that petitioner also argues that his *Miranda* waiver was not knowing or intelligent, the test for whether a Miranda waiver is voluntary is essentially the same as the test for whether a confession is voluntary. See Connelly, 479 U.S. at 169-170 ("There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context. The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion"); see also Moran v. Burbine, 475 U.S. 412, 421 (1986) (*Miranda* waiver inquiry has two dimensions: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it"). "[A] valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might . . . affec[t] his decision to confess.'" Colorado v. Spring, 479 U.S. 564, 576 (1987)

(quoting Moran, 475 U.S. at 422). Such additional information affects "only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature." Spring, 479 U.S. at 577. "In the due process context, the Supreme Court has explained that voluntariness of a confession is a question of law, reviewed under § 2254(d)(1), and the 'subsidiary factual questions' surrounding the confession are reviewed deferentially under § 2254(d)(2) and § 2254(e)(1)." Seymour v. Walker 224 F.3d 542, 554 n.3 (6th Cir. 2000) (citing Miller, 474 U.S. at 110-112 and Thompson v. Keohane, 516 U.S. 99, 110-113 (1995) (noting that discerning the "circumstances surrounding the interrogation" and drawing other conclusions that require credibility determinations generally implicate issues of fact, but that the voluntariness of a confession and the waiver of the right to counsel involve questions of law)); see also Arizona v. Fulminante, 499 U.S. 279, 287 (1991) ("We normally give great deference to the factual findings of the state court, . . . Nevertheless, the ultimate issue of 'voluntariness' is a legal question requiring independent federal determination") (internal quotation marks and citations omitted).

At the conclusion of the *Walker* hearing held before petitioner's first trial, the trial court denied petitioner's motion to suppress. The partial transcript of the *Walker* hearing contains the ruling, which reads, in pertinent part, as follows:

> All right. I heard the testimony yesterday of three witnesses in this matter, Nurse Smith, Lieutenant Peck from the Detroit Fire Department Arson Squad who was the investigator and Lieutenant Prentice who also is a lieutenant with the Detroit Fire Department Arson Squad serving as an investigator and accompanied Lieutenant Peck to the Detroit Receiving Hospital on June 11, 1982 when the statement was taken.
>
> * * *
>
> I have considered very carefully all of the testimony as it was given, in particular looking at the entire picture as [the prosecutor] phrased it, the totality of all the circumstances that were involved, and it appears that from the initial entrance by Lieutenant Peck into the defendant's hospital room, accompanied by

> Lieutenant Prentice, it appears the defendant was the initiating party once the gentlemen were identified to him in the sense that he indicated to him – to them that he was, in fact, waiting for the opportunity and welcomed the opportunity to tell his side.
>
>                        * * *
>
> I believe that he did freely intelligently, knowingly and voluntarily waived his Constitutional Rights and proceeded to make a statement, and there is no indication on this record that where was any coercion or inducement, threats or duress or anything of that nature in terms of acquiring the statement from the defendant.

Defendant-Appellant's Brief on Appeal, Dec. 18, 1998, Appx. B (part of docket no. 50), at 127-130.  After the retrial, the Michigan Court of Appeals considered petitioner's arguments in assessing the voluntariness of his confession, and ultimately concluded as follows:

> Our review of the record convinces us that the trial court correctly determined that defendant voluntarily, knowingly and intelligently waived his rights and offered the statement in question.  While defendant apparently now contends that his mental illness precluded him from understanding his rights or making a voluntary and intelligent waiver, he did not produce any evidence of mental illness at the suppression hearing.  The trial court cannot have erred by failing to consider unavailable evidence.  Moreover, defendant failed to renew his motion to suppress so that he could present additional evidence regarding his mental illness once he had obtained experts willing to testify that he was mentally ill.  We thus find no error in the denial of defendant's motion to suppress.

Harrington, 2000 WL 33419427, at *2.  The Michigan Court of Appeals therefore affirmed the trial court's finding that the arson investigators used no coercion to induce any incriminating statements from petitioner.  The court gives this finding a presumption of correctness.

In his petition, petitioner argues that Lieutenant Peck "repeatedly deceived" him, telling petitioner that he was there "to help."  Petitioner also argues that he had no criminal history (implying he had no experience with the criminal justice system), that he suffered from mental illness, and that he therefore did not have a sufficient understanding to waive his rights and make

a statement to the investigators.  For present purposes, the court assumes that it is true that

petitioner had no criminal background.  The court also assumes that petitioner was suffering from

physical injuries at the time he made his statement, otherwise he would not have been

hospitalized.  However, notwithstanding his injuries, petitioner was fully conscious and able to

converse with the investigators, and there is no evidence that he had been given any drugs which

affected his ability to understand what he was doing.

The court also assumes that petitioner was mentally ill, for the jury found that he was at

the time of his crimes.  However, the jury also implicitly found that petitioner was capable of

appreciating the nature of his actions, and there is no evidence that his mental condition had

deteriorated between the time of his crimes and his hospitalization.  Although petitioner now

claims that Lt. Peck "deceived" him by "saying he was there to help," petitioner did not testify at

the *Walker* hearing, nor did he offer other evidence that Peck promised him unspecified "help" in

exchange for petitioner's cooperation.

Even if the court were to credit petitioner's unsubstantiated claim that the investigators

encouraged him to confess by using promises of "help," the court finds nothing in the record to

suggest that the investigators used any questioning techniques which would have overborne

petitioner's will.  "[A] promise of leniency is relevant to determining whether a confession was

involuntary and, depending on the totality of the circumstances, may render a confession

coerced." Clanton v. Cooper, 129 F.3d 1147, 1159 (10th Cir. 1997) (citations omitted); see also

United States v. Wrice, 954 F.2d 406, 411 (6th Cir. 1992) ("we concede, for the sake of argument,

that a promise of lenient treatment or of immediate release may be so attractive as to render a

confession involuntary").  However, petitioner has not claimed that he was promised leniency,

only unspecified "help."

"[E]ffective interrogation techniques require, to some extent, a carrot-and-stick approach to eliciting information from an uncooperative suspect." Williams v. Withrow, 944 F.2d 284, 289 (6th Cir.1991), rev'd on other grounds, Withrow v. Williams, 507 U.S. 680. Here, petitioner was not uncooperative, but instead appears to have been eager to talk. Lieutenant Peck testified at trial that before he spoke to petitioner, he identified himself as an arson investigator, and exhibited his badge. Transcript of Jury Trial, Dec. 10, 1996, at 45, 63-64. Peck further testified that petitioner was "more then [sic] willing to talk[.]" Id. at 49. Both Peck and Lieutenant Prentice further testified that petitioner said something to the effect of "don't ever do what I done it ain't worth it or ever worth it." Id. at 67, 56, 72. Therefore, petitioner's confession was accompanied by a statement of remorse, suggesting that it was his own conscience – and not the investigators – which caused him to want to talk. Petitioner's expression of remorse also suggests that petitioner was indeed capable of understanding the nature of his predicament and the consequences he would likely face.

Petitioner, who had a college education, also told the investigators that he understood the rights he was waiving and wanted to tell them what happened. Id. at 47-49. The interview lasted only about 40 minutes, and at no point did petitioner give any indication that he did not understand, that he did not want the investigators there, or that he was physically too uncomfortable to continue. The trial testimony also contains no indication that petitioner's mental illness prevented him from understanding and waiving his rights. Viewing the totality of the circumstances, this is not the "rare" case in which a suspect "can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement

officers adhered to the dictates of *Miranda*."  Berkemer v. McCarty, 468 U.S. 420, 433 n. 20 (1984).  These circumstances do not rise to the level of the  involuntary-confession fact patterns that Supreme Court precedents have condemned.

Most critically, petitioner has presented no evidence of police coercion, a required element of his claim.  Given the lack of coercion, petitioner cannot show that the facts of this case are equivalent to those in Mincey, 437 U.S. at 385 or in Beecher v. Alabama, 389 U.S. 35 (1967), in which the Supreme Court held the statements at issue – likewise made by injured suspects – to be involuntary.   In those cases, there was clear evidence of coercion in addition to a serious medical condition and compromised mental state.  See Mincey, 437 U.S. at 398-401 (petitioner was hospitalized in intensive care unit with gunshot wounds, made comments which were not entirely coherent, and – despite his "debilitated and helpless condition" –  repeatedly expressed his wish not to be interrogated); Beecher, 389 U.S. at 36-38 (petitioner's two confessions were the product of "gross coercion"; initial confession was made after petitioner had been shot in the leg and officer pointed a rifle to petitioner's head, while second, written confession, made a week later in prison hospital, was made while petitioner was in a "kind of slumber" due to repeated morphine injections and was left alone with investigators by medical assistant, who warned petitioner to "cooperate" and, in officers' presence, asked to be informed if petitioner did not tell them what they wanted to know).

In this case, the injuries for which petitioner was hospitalized included a gunshot wound to his upper left arm, burns, and smoke inhalation.  However, petitioner's injuries do not appear to have been life-threatening.[16]  Moreover, there is no evidence that petitioner's mental faculties

---

[16]Although petitioner had been shot and suffered from smoke inhalation and burns, he was
(continued...)

were impaired during questioning as a result of his injuries. Although petitioner was likely physically uncomfortable, he appeared to the investigators to be anxious to talk to them, even after they advised him of his rights. The mere fact that the petitioner was hospitalized is simply not enough to establish that his statements were unknowing or involuntary. See Abela v. Martin, 380 F.3d 915, 928-929 (6th Cir. 2004) (state court decisions rejecting petitioner's claim that his statements were involuntary and unknowing were not unreasonable; even though petitioner was interrogated while he was being treated in a hospital emergency room for a broken nose, there was no evidence that petitioner's mental faculties were impaired during questioning or that police used coercive tactics).

Finally, to the extent that petitioner seeks to claim that his mental illness was sufficient to render his statements involuntary, Supreme Court authority does not support his position. "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." Connelly, 479 U.S. at 165. Therefore, even where a criminal defendant claims to have been suffering from mental illness at the time of a confession, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Id. at 167. In any event, the question is not whether a state court could plausibly extend the applicable United States Supreme Court

---

[16](...continued)
fully conscious and capable of obeying orders at the time he was taken into custody by plainclothes Detroit police officer Thomas Robinson. Transcript of Jury Trial, Dec. 5, 1996 (docket no. 30) at 145-147. Photos later taken of petitioner while he was hospitalized, which were exhibited to jurors at the retrial, show petitioner lying in bed, wearing a respirator and sporting a heavily bandaged left arm and hand. Transcript of Jury Trial, Dec. 11, 1996 (docket no. 33) at 130-133.

precedent to the fact pattern of this case, but rather whether the Michigan courts acted unreasonably in declining to extend that precedent to petitioner's case. The Michigan courts did not act unreasonably in rejecting this claim.[17] Because the Michigan courts' decisions were neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, petitioner is not entitled to habeas relief on this claim.

**B. Remaining Claims**

Petitioner's remaining claims challenge various aspects of his trial, sentence, and appeal. The respondent argues that the claims are procedurally defaulted because petitioner did not raise them until he filed his motion for relief from judgment. Therefore, before reaching the merits of these remaining claims, the court must determine whether the claims have been procedurally defaulted.

"In general, a federal court may not consider a claim for habeas corpus relief if the claim was procedurally defaulted in state court- *i.e.*, if the last state court to render a judgment in the case rejected the claim because it was not presented in accordance with the state's procedural

---

[17]This case is not like the unpublished case of Hanna v. Price, 245 Fed. Appx. 538 (6th Cir. 2007), which affirmed a district court decision granting habeas in part based on the admission of the petitioner's hospital confession. In that case, as in this case, there appears to have been no element of police coercion, a factor which seems to have escaped the attention of the panel deciding that case. However, the petitioner's physical condition in that case was clearly more serious; he suffered from gunshot wounds to the chest, abdomen, and leg, and was unable to speak above a whisper. In addition, his answers to the officer's questions "expressed obviously delusional beliefs and were sometimes confused and nonsensical." Id. at *540. A court-appointed expert in forensic psychology also testified at the suppression hearing that the petitioner "was obviously mentally ill and delusional," id., and that he was not able to think through the decision to waive his rights. Id. at 541.

rules." Hargrave-Thomas v. Yukins, 374 F.3d 383, 387 (6th Cir.2004). "When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis." Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." Id. "Second, the court must decide whether the state courts actually enforced the state procedural sanction." Id. "Third, the court must decide whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim." Id.

If these factors are satisfied, a petitioner can overcome the procedural default by either "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrat[ing] that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson 501 U.S. 722, 750 (1991). "Cause" for default requires a showing that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). Ineffective assistance of counsel can constitute cause, so long as the ineffective assistance of counsel claim is not itself procedurally defaulted. Id. at 489; see also Edwards v. Carpenter, 529 U.S. 446, 453 (2000) ("an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"). "Prejudice," on the other hand, requires a showing that the errors at trial "worked to [petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982).

In order for a procedural default to bar federal review of a claim, "the last state court rendering a judgment in the case must have based its judgment on the procedural default." Simpson v. Jones, 238 F.3d 399, 406 (6th Cir. 2000). "A procedural default analysis, then, is two-fold: the federal court must determine if a petitioner failed to comply with a state procedural rule; and it also must analyze whether the state court based its decision on the state procedural rule." Id. For purposes of procedural default, the "state judgment" with which the court is concerned is "the last explained state court judgment." Ylst v. Nunnemaker, 501 U.S. 797, 805 (1991).

Here, the last explained state court judgment is the Michigan Supreme Court's order denying review of petitioner's claims on the basis that petitioner had "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." The Sixth Circuit has held that orders such as that issued by the Michigan Supreme Court constitute "explained" state court judgments for purposes of procedural default. Munson v. Kapture, 384 F.3d 310, 314 (6th Cir. 2004) (citing Simpson, 238 F.3d at 407-08). "It is well-established in this circuit that the procedural bar set forth in Rule 6.508(D) constitutes an adequate and independent ground on which the Michigan Supreme Court may rely in foreclosing review of federal claims." Munson, 384 F.3d at 315 (citations omitted); see also Ivory v. Jackson, 509 F.3d 284, 291-293 (6th Cir. 2007) (where petitioner failed to raise ineffective-assistance-of-trial-counsel claim on direct appeal, Michigan appellate courts' one-sentence orders stating that petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)" constituted orders based on an independent and adequate state procedural rule).

Having determined that petitioner's remaining claims have been procedurally defaulted,

the court must next consider whether he has established the requisite "cause" and "prejudice" to permit consideration of the merits of his claims. Id. Here, petitioner presumably asserts constitutionally ineffective assistance of appellate counsel as cause for his procedural default of his claims. However, as noted above, the ineffective assistance claim asserted as cause for the procedural default of a claim must not itself have been procedurally defaulted. Edwards, 529 U.S. at 453. "To constitute cause, that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted." Burroughs v. Makowski, 411 F.3d 665, 668 (6th Cir. 2005).

As the court has noted above, petitioner has asserted a claim of ineffective assistance of appellate counsel. He includes this claim as part of another claim attacking the trial court's jury instructions and sentence. Therefore, the question becomes whether this claim of ineffective assistance of appellate counsel is procedurally defaulted.[18]

In the brief which he filed in support of his motion for relief from judgment, petitioner claimed, among other things, that appellate counsel was constitutionally ineffective for not raising additional "obvious viable arguable issues" which would have been beneficial to petitioner. Brief in Support of Motion for Relief from Judgment (attached to docket no. 2) at 93. Although this vague allegation is hardly sufficient, petitioner also identifies a number of specific issues as bases for his claim of ineffective appellate counsel. These include the following: (1) appellate counsel's failure to argue on direct appeal that the trial court should have given requested jury instructions on the lesser offenses of voluntary manslaughter, assault with intent to

[18]As part of his fourth and final claim for habeas relief, petitioner also attacks the prosecutor's closing argument, which he argues encouraged the jury to issue a "compromise" verdict of guilty but mentally ill. However, the petition does not contain a claim of ineffective assistance of appellate counsel based on this argument.

do great bodily harm less than murder, and felonious assault, id. at 94; (2) appellate counsel's failure to raise issues regarding the severity of the sentences, id.; (3) appellate counsel's failure to challenge the consecutive sentences; id. at 95; and (4) appellate counsel's failure to raise the issue of petitioner's sentence on a 1986 conviction for an offense petitioner committed while he was incarcerated.

To prevail on a claim of ineffective assistance of counsel, the petitioner must satisfy two requirements. First, he must demonstrate that his counsel's performance was constitutionally deficient, i.e., that it fell below an objective standard of reasonableness. Strickland v. Washington, 466 U.S. 668, 687-688 (1984). Second, the petitioner must "affirmatively prove prejudice." Id. at 693. This requires him to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

The scrutiny of counsel's performance is highly deferential, and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. Nevertheless, a court deciding a claim of actual ineffectiveness of counsel on "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. However, the evaluation of prejudice, unlike the evaluation of counsel's performance, may be made with the benefit of hindsight. See Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (ineffective assistance claims "will be raised only in those cases where a defendant has been found guilty of the offense charged, and from the perspective of hindsight there is a natural tendency to speculate as to whether a different trial strategy might have been more

successful. We adopted the rule of contemporary assessment of counsel's conduct because a more rigid requirement 'could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.' . . . But the 'prejudice' component of the *Strickland* test does not implicate these concerns. It focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. . . . Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him") (citations omitted).

In attempting to demonstrate that his appellate counsel's failure to raise a particular issue on appeal constitutes deficient performance, it is not sufficient for petitioner to show merely that counsel omitted a nonfrivolous argument. The Supreme Court has never held that a defendant has a constitutional right to have counsel raise every nonfrivolous issue on appeal if counsel, as a matter of professional judgment, decides not to present those points. Jones v. Barnes, 463 U.S. 745, 751 (1983); Bowen v. Foltz, 763 F.2d 191, 194 n.4 (6th Cir. 1985). As the Supreme Court has observed, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones, 463 U.S. at 751-752. "There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review." Id. at 752-753. "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Smith v. Robbins, 528 U.S. 259, 288 (2000).

Although it is still possible to bring an ineffective assistance claim based on appellate counsel's failure to raise an issue, it is difficult to demonstrate that counsel was incompetent. Id. Moreover, even if a habeas petitioner does succeed in demonstrating that appellate counsel was incompetent in failing to raise a particular issue on appeal, he must still establish that there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. Howard v. Bouchard, 405 F.3d 459, 485 (6th Cir. 2005). The Sixth Circuit has held that "'appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit.'" Willis v. Smith, 351 F.3d 741, 745 (6th Cir. 2003) (quoting Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir. 2001)).

In this case, petitioner conceded in his motion for relief from judgment that he brought all of the issues he thought should be appealed to the attention of appellate counsel, who refused to raise them. Brief in Support of Motion for Relief from Judgment at 96-97. Given petitioner's concession that he directed counsel's attention to what petitioner believed were the issues which should have been raised on direct appeal, it does not appear to be the case that counsel mistakenly neglected to raise these issues; instead, it appears that counsel had the necessary information yet nonetheless affirmatively decided not to pursue certain issues on appeal. However, counsel's decision not to raise an issue on appeal does not implicate constitutional concerns unless such a decision is so suspect as to indicate that the petitioner effectively was without counsel. See McMeans v. Brigano, 228 F.3d 674, 682 (6th Cir.2000) ("In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions. . . . Strategic choices by counsel, while not necessarily those a federal

judge in hindsight might make, do not rise to the level of a Sixth Amendment violation")
(citations omitted).  Here, the decision of petitioner's appellate counsel not to assert the
remaining claims on direct appeal was not unreasonable and therefore does not provide a basis
for excusing procedural default.

Petitioner argues that appellate counsel should have sought reversal of the convictions
based on the trial court's failure to "give proper requested instructions."  It is not entirely certain
to what "requested instructions" petitioner intends to refer.  Based on arguments which he made
in his motion for relief from judgment, it would appear that petitioner thought appellate counsel
should have urged a retrial which included instructions on additional lesser-included offenses of
manslaughter, assault with intent to do great bodily harm less than murder, and felonious assault.
Even assuming that appellate counsel could have raised as an issue on appeal the trial court's
failure to give specified jury instructions on additional lesser-included offenses which had been
requested by petitioner's trial counsel, appellate counsel could well have had a strategic reason
for not seeking a retrial on lesser-included offenses: a desire to see his client retried and *acquitted*
based on the insanity defense, not convicted on some lesser "compromise" offenses.  Moreover, it
is clear that appellate counsel did raise one issue suggesting that a pure acquittal was part of his
strategy.  Specifically, he argued that the "guilty but mentally ill" verdict violated due process by
unfairly encouraging a compromise verdict of conviction.  Under the circumstances, it is simply
not possible to conclude that appellate counsel performed unreasonably by not raising the issue of
lesser-included offense jury instructions.  See Lewis v. Russell, 42 Fed. Appx. 809, 810-11 (6th
Cir.2002) (unpublished) (holding trial counsel's failure during murder trial to request jury
instruction on lesser-included offense of voluntary manslaughter constituted reasonable strategic

decision consistent with defendant's effort to seek full acquittal on basis of self-defense, and thus did not constitute deficient performance); Edwards v. Mack, 4 Fed. Appx. 215, 217-18 (6th Cir.2001) (unpublished) (finding counsel's waiver of jury instructions on lesser-included offenses was not ineffective assistance, where defendant did not want jury instructed on lesser included offenses, but instead hoped to obtain an acquittal by having jury instructed on the murder charge only; moreover, even if counsel pursued strategy without the defendant's permission, it constituted a proper exercise of counsel's judgment to waive lesser included offense instructions). Because the court is not convinced that appellate counsel performed unreasonably by not raising the issue of additional lesser-included offense jury instructions as a basis for appeal, it is unnecessary for the court to determine whether the petitioner was prejudiced by counsel's actions.

As for the remaining defaulted claims, the requisite prejudice cannot be shown if the claims are found to lack merit.  Burton v. Renico, 391 F.3d 764, 774 (6th Cir. 2004).   Here, there is no reasonable probability that raising these issues would have changed the result of petitioner's direct appeal.  Therefore, petitioner cannot satisfy the second component of the *Strickland* standard with respect to these claims.

Petitioner raises two claims regarding his sentences:  (1) that they are too severe, and (2) that they are impermissibly consecutive.  To the extent that these claims are based upon alleged violations of Michigan law, petitioner has failed to state a claim upon which habeas relief may be granted.  See 28 U.S.C. § 2254(a) (application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court may be entertained "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"); Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir.1988) (errors in the application of state law are usually not

to be questioned in a federal habeas corpus proceeding"). Moreover, petitioner does not contend that his sentences exceed the maximum which could have been imposed, and "a sentence within the statutory maximum set by statute generally does not constitute 'cruel and unusual punishment.' " United States v. Organek, 65 F.3d 60, 62 (6th Cir.1995) (citation omitted). Although the Eighth Amendment contains a "narrow proportionality principle" which applies to noncapital sentences, Ewing v. California 538 U.S. 11, 20 (2003), under this principle, petitioner's sentence is neither "extreme" nor "grossly disproportionate" so as to violate the Eighth Amendment. Austin v. Jackson, 213 F.3d 298, 302 (6th Cir. 2000).

Finally, petitioner alleges that in 1986, he was convicted on a felony charge for an offense committed in prison, and that because of his conviction of the charges in the 1982 incident at issue in this case, he pled guilty to the later charge and was sentenced on that charge as a habitual offender. Petitioner now argues that because his prior convictions – the ones at issue in this case – were subsequently reversed on a delayed appeal, he should have been resentenced on the later conviction. However, petitioner's appellate counsel could not have raised any particular argument on direct appeal of the convictions at issue in this case which would have directly resulted in the 1986 conviction or sentence being vacated. Instead, petitioner would have had to file a separate appeal or proceeding attacking the 1986 conviction. Moreover, even if petitioner may still be deemed to be "in custody" on the 1986 conviction, that conviction is not properly a part of the current federal petition, absent any indication that petitioner has exhausted his state remedies with respect to the later conviction.

The remaining question is whether the court's failure to consider the substantive merits of the defaulted claims will result in a miscarriage of justice. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a

federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Murray, 477 U.S. at 496. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998) (citation omitted). Under the miscarriage-of-justice exception, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" House v. Bell, 547 U.S. 518, 537 (2006) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). This rule ensures that the petitioner's case is truly "extraordinary," while providing a meaningful avenue by which to avoid manifest injustice. Id.

Here, petitioner has not claimed that new, reliable evidence not presented at trial establishes his actual innocence. Instead, petitioner argues not that he is factually innocent, but instead that he is legally innocent because of his mental illness. Therefore, petitioner has not made the showing required to establish a miscarriage of justice. Petitioner's second, third, and fourth claims are thus barred by procedural default and do not warrant relief.

## V

## Conclusion

For the reasons stated, the court will enter judgment denying the petition.

Entered this 4th day of November, 2008.

/s/ Wendell A. Miles
Wendell A. Miles, Senior Judge